AO 106A  (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

FILED
United States District Court
Albuquerque, New Mexico
Mitchell R. Elfers
Clerk of Court

# UNITED STATES DISTRICT COURT
for the
District of New Mexico ▾

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>INFORMATION ASSOCIATED WITH (505) 526-3366<br>THAT IS STORED AT PREMISES CONROLLED BY<br>VERIZON WIRELESS | )<br>)<br>)  Case No.  23-MR-2231<br>)<br>)<br>) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
See Attachment A, attached hereto and incorporated herein by reference.

located in the _____ District of _____ New Jersey _____ , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B, attached hereto and incorporated herein by reference

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*
- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 371, 666, 1343,<br>1346, 1951 | Conspiracy; Bribery; Wire Fraud; Honest Services Fraud; Hobbs Act Extortion<br>Under Color of Official Right |

The application is based on these facts:
The affidavit of Special Agent Zackari Mercado is incorporated herein by reference, which has been approved by AUSA Shana B. Long.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Zackari Mercado, FBI
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
telephonically sworn and electronically signed     *(specify reliable electronic means).*

Date:     12/04/2023
_____
*Judge's signature*

City and state:  Albuquerque, New Mexico       Karen B. Molzen, United States Magistrate Judge
_____
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| |
|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH (505) 526-3366 THAT IS STORED AT PREMISES CONROLLED BY VERIZON WIRELESS |

## AFFIDAVIT IN SUPPORT OF APPLICATION

I,  Zackari S. Mercado, Special Agent of the Federal Bureau of Investigation ("FBI"), being duly sworn, depose and state that:

## INTRODUCTION

1.      I make this affidavit in support of an application for a search warrant for information associated with certain accounts that is stored at premises owned, maintained, controlled, or operated by Verizon Wireless, a wireless provider headquartered at 180 Washington Valley Road, Bedminster, New Jersey 07921.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Verizon Wireless to disclose to the government records and other information in its possession pertaining to the subscriber or customer associated with the accounts, including the contents of communications.

2.      I have been a Special Agent with the FBI since August 25, 2023. I have received basic law enforcement training at the FBI Academy in Quantico, Virginia. I am currently assigned to the FBI's Albuquerque Field Office, where I am responsible for conducting and assisting in public corruption investigations, including related white-collar and financial crimes. My training included instruction on investigative tools and criminal law, such as the development and

identification of probable cause to support the affidavits in support of applications to intercept wire and electronic communications. I have become familiar with the methodology utilized in criminal conspiracies and activities.

3.    Since becoming an FBI agent, I have (a) conducted, monitored, and reviewed physical surveillance, in investigations involving public corruption matters; (b) executed search warrants at locations where records of criminal activity have been found; (c) reviewed and analyzed numerous recorded conversations and other documentation of criminal activity; (d) debriefed confidential human sources; and (e) conducted other surveillance of individuals engaged in public corruption and white-collar crimes. As a result of my training and experience, I am aware that public corruption and white-collar criminals frequently use wire and electronic communications in furtherance of their criminal activities. I am also aware that such criminals often communicate using vague, guarded, or coded language when discussing their illegal activities in an effort to further prevent detection.

4.    The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.    Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 1951 (Hobbs Act extortion under color of official right), 18 U.S.C. § 371 (conspiracy), 18 U.S.C. § 666 (bribery), 18 U.S.C. §1343 (wire fraud) and 18 U.S.C. §1346 (honest services fraud) (the "TARGET OFFENSES") have been committed by Ricardo MENDEZ, Joshua MONTANO, Honorio ALBA and others both known and unknown to the government (the "TARGET SUBJECTS").  There is also probable cause to

search the information described in Attachment A for evidence, instrumentalities, contraband, and/or fruits of these crimes further described in Attachment B.

## JURISDICTION

6.      This Court has jurisdiction to issue the requested warrant because it is a "court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## BASIS OF INFORMATION

7.      I make this affidavit based upon personal knowledge derived from my participation in this investigation and upon information I believe to be reliable from the following sources:

    a. My experience and the experience of experienced public corruption investigators investigating public-corruption, white-collar criminal conspiracies, and experience investigating complex criminal conspiracies;

    b. oral and written reports, as well as documents about this investigation that I have received from members of the FBI and other federal law enforcement agencies;

    c. discussions I have personally had concerning this investigation with experienced public corruption and white-collar investigators;

    d. telephone toll records, pen register information, trap and trace information, and telephone subscriber information;

    e. financial records;

    f. consensual recordings;

    g. statements of a confidential source;

    h. interviews of witnesses;

    i. messages sent to and from the **MENDEZ PHONE**.

8.    In addition to the foregoing, I specifically relied on oral reports/opinions from other law enforcement officers.

9.    Since this Affidavit is being submitted for the limited purpose of obtaining a search warrant, I have not included each and every fact known to me concerning this investigation or every aspect of the investigation to date. I have set forth only the facts that I believe are necessary to establish the foundation for probable cause for the requested warrant.

## SOURCES OF INFORMATION

10.    Special Agents of the FBI have received information concerning the illegal conspiracy detailed throughout this affidavit from individuals cooperating with the government, including Confidential Witness #1 ("CW1").

11.    CW1 began cooperating with law enforcement on or about September 1, 2023. CW1 has provided FBI agents with information concerning the TARGET OFFENSES and the TARGET SUBJECTS.

12.    CW1's information has been verified through consensually monitored and recorded text messages and phone calls between CW1 and Ricardo MENDEZ in which Ricardo MENDEZ corroborated specifics of the scheme as detailed by CW1. Additionally, the information provided by CW1 has been verified by financial and toll records obtained through subpoenas. Further, all calls between CW1 and the **MENDEZ PHONE** have been verified through pen register data and toll records. Additionally, all electronic communications between CW1 and the **MENDEZ PHONE** have been verified via copies of the communications that were retrieved from CW1's phone, using photographs which have allowed law enforcement to preserve historical communications.

13.     CW1 has not received any benefits from law enforcement for cooperating in this investigation. CW1 has not been offered any benefits from law enforcement, to include financial rewards or promises of leniency.  CW1 has no reported criminal history, with the exception of the arrest of CW1 by Joshua MONTANO, as detailed herein. Based on the information provided by CW1 and the other information available as a result of this investigation, law enforcement believes CW1 is credible and that the information provided is reliable.

14.     It is my opinion that CW1 is motivated to cooperate with law enforcement because CW1 views themself as a victim of an attempted extortion by Ricardo MENDEZ.

## FACTS ESTABLISHING PROBABLE CAUSE

### I.     *Overview and Background*

15.     The United States is investigating potential violations of crimes including 18 U.S.C. § 1951 (Hobbs Act extortion under color of official right), 18 U.S.C. § 371 (conspiracy), 18 U.S.C. § 666 (bribery), 18 U.S.C. §1343 (wire fraud) and 18 U.S.C. §1346 (honest services fraud) committed by Ricardo MENDEZ, Joshua MONTANO, Honorio ALBA, and others both known and unknown to the government.

16.     For the reasons described below, there is reason to believe that Albuquerque Police Department (APD) Police Officer Joshua MONTANO, APD Police Officer Honorio ALBA, and others yet unknown, divert or refer individuals arrested for Driving While Impaired (DWI) to Ricardo MENDEZ (a defense investigator for a criminal defense attorney in Albuquerque), and that Ricardo MENDEZ, while working in concert with Joshua MONTANO and Honorio ALBA, subsequently requests cash payments from the alleged DWI offenders in exchange for the offenders' charges being improperly dismissed or not filed.

## II.     *Relevant Individuals and Entities*

17.     Ricardo MENDEZ is believed to be a defense investigator/paralegal at Thomas Clear's law firm, Clear & Clear PA. According to its website, Clear & Clear PA is a criminal defense law firm founded in 1982 and located in Albuquerque, New Mexico. The website states that Clear & Clear PA is a full-service firm that regularly defends individuals against a variety of felony and misdemeanor criminal charges.

18.     The investigation has revealed that Ricardo MENDEZ handles client consults, pre-trial interviews, and other tasks for attorney Thomas Clear. According to the website for Clear & Clear PA, Ricardo MENDEZ works with clients daily, keeping them posted on the status and progress of their cases. Ricardo MENDEZ is believed to be the user of (505) 980-4946, hereinafter the **MENDEZ PHONE**. Records received pursuant to subpoena have shown that Verizon Wireless is the telephone service provider for **MENDEZ PHONE**.

19.     Joshua MONTANO is a police officer with APD.  Joshua MONTANO is assigned to the DWI unit, the unit within the APD primarily responsible for the investigation of DWI offenses. Joshua MONTANO is believed to be the user of (505) 918-8132, hereinafter the **MONTANO PHONE**. Records received pursuant to subpoena have shown that AT&T Corporation is the telephone service provider for **MONTANO PHONE**.

20.     Honorio ALBA is a police officer with APD. Honorio ALBA is assigned to the DWI unit, the same unit as Joshua MONTANO. Honorio ALBA is the user of (505) 526-3366, hereinafter the **ALBA PHONE**.[1] Records received pursuant to subpoena have shown that Verizon

---

[1] Honorio ALBA is believed to be the user of the **ALBA PHONE** based on a review of open-source records, to include the CLEAR Law Enforcement Database. According to Verizon Wireless, Honorio ALBA is also the listed subscriber for the **ALBA PHONE**.

Wireless is the telephone service provider for **ALBA PHONE**.

### III.    The April 2022 arrest of Witness #1 by Joshua MONTANO

21.    On or about April 29, 2022, the FBI received an allegation from an attorney who was contacted by a separate criminal defense attorney about a potential client. The client will hereinafter be referred to as Witness #1 (W1).[2] W1 was subsequently interviewed by the FBI on October 5, 2023, after CW1 came forward with a similar account. When W1 spoke with agents in October 2023, they had already pled guilty to the DWI charge at issue, detailed further below. W1 has not received any benefits from law enforcement for cooperating in this investigation.[3] W1 has not been offered any benefits from law enforcement, to include financial rewards or promises of leniency. W1 has no reported criminal history, with the exception of the arrest of W1 by Joshua MONTANO, as detailed herein, and a charge for driving on a revoked driver's license, which was recently dismissed. Based on the information provided by W1 and the other information available as a result of this investigation, law enforcement believes W1 is credible and that the information provided is reliable.

22.    Information gathered during W1's interview is summarized below.

23.    On or about Friday, April 22, 2022, at approximately 1:30 a.m., W1 was driving northbound on I-25. APD Police Officer Joshua MONTANO stopped W1 in the vicinity of the Comanche exit on northbound I-25.

---

[2] The FBI referred the April 29, 2022, allegation to APD Internal Affairs on June 24, 2022.

[3] W1 stated that he was willing to talk to agents because he wanted to do what was right, and that he believed others would pay the money to try to get out of trouble.

24.     Joshua MONTANO asked W1 if W1 had been drinking. W1 denied drinking. Joshua MONTANO conducted a field sobriety test on W1. After administering the test, Joshua MONTANO advised that W1 had failed. Joshua MONTANO then arrested W1 and transported W1 to a police station in downtown Albuquerque, New Mexico.

25.     Once at the police station, an unidentified individual gave W1 a "breath test."[4] Joshua MONTANO remained present during the administration of the test.[5] The breath test result was .21, which qualified as an aggravated driving while under the influence (DWI) in New Mexico.[6] After the administration of the test, an officer (either Joshua MONTANO or another officer) clarified W1's identifying information. W1 did not recall exactly what identifiers W1 provided, but thought it included address, phone number, date of birth and social security account number.

26.     A transport vehicle eventually arrived to transport W1 to the Metropolitan Detention Center (MDC), which is located in Albuquerque. W1 went to the restroom prior to loading into the transport vehicle. Joshua MONTANO escorted W1 to the restroom. While in the restroom, Joshua MONTANO told W1 that he had found the bag of mushrooms in W1's car and

---

[4] I understand that when W1 is referring to a "breath test," this is in reference to a breathalyzer. A breathalyzer is a breath alcohol testing instrument used by law enforcement to estimate a person's blood-alcohol levels by testing the alcohol content of that person's breath.

[5] The FBI reviewed Joshua MONTANO's body camera footage. Based on that review, the FBI believes it was in fact Joshua MONTANO who administered the test.

[6] Under New Mexico state law, it is unlawful for a person who is under the influence of intoxicating liquor to drive under the influence. *See* NMSA 1978, § 66-8-102(A). A person commits driving under the influence (DUI) if that person has a blood alcohol concentration (BAC) of at least .08. *See id.* at § 66-8-102(C)(1). A person commits aggravated DUI if he or she has a BAC of .16 or higher. *See id.* at § 66-8-102(D)(1).

8

that W1 should feel lucky it was Joshua MONTANO that found it and not someone else.[7] Joshua MONTANO said he would not charge W1 for possession of the mushrooms. Joshua MONTANO also told W1 that when W1 got out of jail, someone would call W1 to help W1 resolve this situation. W1 did not understand what Joshua MONTANO meant. Joshua MONTANO was in police uniform during the entirety of their interactions.[8]

27.    When W1 was eventually released from custody, APD personnel returned all W1's belongings, except for W1's driver's license. W1 last recalled seeing it during the traffic stop.[9]

28.    According to W1, on or about Monday, April 25, 2022, W1 called and left messages with three or four law firms but did not speak with anyone. W1 could not remember the specific law firms.[10]

29.    According to W1, on April 25, 2022, around 4:00 p.m. or 5:00 p.m., W1 received a telephone call from Ricardo MENDEZ. Agents have reviewed toll records for the **MENDEZ PHONE**, which show that, on April 25, 2022, at approximately 4:55 p.m., the **MENDEZ PHONE**

---

[7] During his October 2023 interview with FBI agents, W1 admitted that W1 had a bag containing mushrooms in the vehicle when W1 was arrested. Based on my training and experience, I believe that the term "mushrooms" refers to psilocybin mushrooms. Psilocybin is a Schedule I controlled substance under New Mexico state law. *See* NMSA 1978, § 30-31-6(C)(14).

[8] The FBI obtained a copy of Joshua MONTANO's body camera footage from April 22, 2022. The footage on the body camera was consistent with W1's description of events. However, based on a review of the footage, Joshua MONTANO appears to have removed his body camera and left it unattended during the period when W1 used the bathroom.

[9] According to New Mexico state court records, W1 was charged by criminal complaint and booked into custody on April 22, 2022.

[10] A subpoena seeking W1's phone records from Verizon Wireless for W1's phone calls during this time has been requested but the returns have not yet been received.

called W1's phone and the call lasted approximately 3 minutes.[11] The phone contact is consistent with what W1 described during his interview.[12] During the phone call, Ricardo MENDEZ asked W1 if W1 was interested in a free consultation. Ricardo MENDEZ told W1 that he was aware of W1's current DWI situation. W1 and Ricardo MENDEZ agreed to meet on April 27, 2022.[13] W1 indicated that W1 believed at the time that Ricardo MENDEZ was calling on behalf of one of the law firms that W1 had contacted earlier in the day.

30.     On or about April 27, 2022, at approximately 12:00 p.m., W1 met with Ricardo MENDEZ at Thomas Clear's law office, which was a residence located at 7112 Aztec Rd NE, Albuquerque NM 87110. W1 indicated that Thomas Clear was in and out of the room during the meeting.

31.     Upon W1's arrival, W1 observed an unidentified individual leaving Thomas Clear's office. W1 recalled Ricardo MENDEZ telling W1 that the individual who was leaving the office was on his way to an ATM to withdraw money.

32.     During the meeting, Ricardo MENDEZ told W1 that W1's DWI arrest could all be made to go away and that W1 would not have to attend an arraignment. Ricardo MENDEZ told W1 that if W1 agreed to pay Ricardo MENDEZ $10,000 and plead not guilty, W1's case would all go away. Thomas Clear was in a corner of the room working on a laptop while Ricardo

---

[11] Verizon Wireless does not retain historical text message data beyond one-year.

[12] Toll records for the **MENDEZ PHONE** from April 25, 2022, do not show any calls from W1 to the **MENDEZ PHONE** on that day.

[13] At the time the FBI interviewed W1, W1 was no longer in possession of Ricardo MENDEZ's telephone or text messages between W1 and Ricardo MENDEZ.

MENDEZ was speaking with W1. W1 had no doubt that Thomas Clear was able to hear what Ricardo MENDEZ told W1.

33.     Ricardo MENDEZ then pulled out W1's license from a shirt pocket and placed it on the desk in front of W1.[14] W1 asked Ricardo MENDEZ when W1 could get the driver's license back. Ricardo MENDEZ responded that W1 could have it back as soon W1 paid Ricardo MENDEZ. W1 told Ricardo MENDEZ that W1 did not have $10,000. In response, Ricardo MENDEZ told W1 that W1 could pay $5,000 up front and make $1,000 monthly payments until the debt was settled. Ricardo MENDEZ told W1 that W1 had until the following day to pay – that is, April 28, 2022.

34.     When W1 asked Ricardo MENDEZ about getting a second legal opinion, Ricardo MENDEZ replied that W1 was looking at felony charges for the mushrooms. W1 told Ricardo MENDEZ that W1 was never charged with the mushrooms, to which Ricardo MENDEZ and Thomas Clear then both responded in near-unison, "Not yet."[15] W1 interpreted this to imply that that if W1 did not pay Ricardo MENDEZ $10,000, W1 would be charged with a felony. Thomas

---

[14] In my training and experience I am not aware of any legitimate reason that a defense attorney's employee would be given an arrestee's identification card by the arresting officer before the arrestee had retained the services of the law firm.

[15] The FBI has reviewed the criminal complaint, police report, and "tow-in" report filed by Joshua MONTANO relating to W1's arrest on April 22, 2022. The complaint and police report make no mention of any mushrooms being found in W1's vehicle. The tow-in report indicates that mushrooms were located in a clear bag in the center console of the vehicle. Because I believe it unlikely that Ricardo MENDEZ could have received the tow-in report from the arrest through a public records request during that short period, I believe that Ricardo MENDEZ may have learned of the mushrooms in W1's vehicle by speaking with Joshua MONTANO directly. Based on my training, experience, and information gathered in the instant investigation, I am not aware of any legitimate reason that a defense attorney's employee would be speaking with the arresting officer about evidence found in the arrestee's vehicle before the arrestee had retained the services of the law firm.

Clear then walked up to the chair where W1 was sitting and showed W1 a website with a list of controlled substances. Thomas Clear stated that mushrooms would fall under the category of a 4th degree felony.

35.    Ricardo MENDEZ said he was friends with Joshua MONTANO and that he obtained W1's driver's license from Joshua MONTANO. W1 believed Thomas Clear was in the room at this time but was unsure. Ricardo MENDEZ then asked W1 if W1 remembered "Josh" telling W1 that someone would call him, seemingly in reference to the conversation W1 had with Joshua MONTANO in the bathroom prior to being transported to MDC. Based on my training and experience, I believe the possession of the license and Ricardo MENDEZ's statements strongly imply that Ricardo MENDEZ was the person who Joshua MONTANO assured W1 would "be in touch" with him. The possession of the license and allusion to Ricardo MENDEZ's relationship with Joshua MONTANO also imply a significant relationship with Joshua MONTANO and the ability to influence the outcome of the pending criminal matter.

36.    W1 asked Ricardo MENDEZ if W1 could think about the offer. Ricardo MENDEZ told W1 that W1 needed to pay by the following day at 6:00 p.m. Ricardo MENDEZ and Thomas Clear then walked W1 out of the meeting and shook W1's hand.

37.    The next day, at approximately 6 p.m. or 7 p.m., W1 received two telephone calls and a text message from Ricardo MENDEZ. W1 did not answer the phone calls or the text message. W1 did not interact with Ricardo MENDEZ or Thomas Clear again.

38.    W1 did not pay Ricardo MENDEZ the requested $10,000 and retained a different attorney to represent W1 in W1's DWI case.

39.     According to a docket obtained from the New Mexico court's system, W1 was charged by Criminal Complaint with DWI, Speeding, and Failure to Maintain Traffic Lane. The Criminal Complaint listed the arresting officer as Joshua MONTANO. W1's DWI case was dismissed about two months later due to Joshua MONTANO being involved in a serious car accident. On or about May 4, 2023, the case against W1 was re-filed. W1 pled guilty to DWI on June 29, 2023 and received a deferred sentence of one year of probation. W1's probation ends on June 29, 2024. The Speeding and Failure to Maintain Traffic Lane charges were dismissed.[16] W1 was never charged with possession of the mushrooms.

40.     Agents reviewed Ricardo MENDEZ's phone records which revealed that on April 22, 2022 (the day of W1's arrest), the **MENDEZ PHONE** called W1's phone at approximately 12:44 p.m. The duration of the call was approximately 1 minute. Although W1 did not mention to agents that he received this call from Ricardo MENDEZ, based on the timing of the call to W1, W1 was likely in custody at the time of the call and would not have had access to his phone.[17] A review of the toll records from for the **MENDEZ PHONE** do not show any incoming calls from W1 to the **MENDEZ PHONE** on April 22, 2022, prior to the **MENDEZ PHONE** attempting to reach W1 at approximately 12:44 p.m.

41.     Agents reviewed Ricardo MENDEZ's phone records which revealed the following calls between the **MENDEZ PHONE** and the **MONTANO PHONE** around the time of W1's

---

[16] W1 also advised agents that on June 17, 2023, W1 was pulled over in Sandoval County and spent three days in jail for driving with a revoked license.

[17] W1 recalled being released from jail around 5 p.m. on April 22, 2022.

13

arrest and W1's meeting with Ricardo MENDEZ. Based on my training, experience, and familiarity with this investigation, the following contacts between the **MENDEZ PHONE** and the **MONTANO PHONE**, when coupled with the timing of the **MENDEZ PHONE's** contact with W1, likely demonstrate that Ricardo MENDEZ and Joshua MONTANO were discussing W1's arrest and the solicitation of payment from W1.

    a.   On or about April 22, 2022, at approximately 10:29 a.m., the **MENDEZ PHONE** received an approximately 1-minute voicemail from the **MONTANO PHONE**.

    b.   On or about April 22, 2022, at approximately 10:33 a.m., the **MENDEZ PHONE** received an approximately 9-minute incoming telephone call from the **MONTANO PHONE**.

    c.   On or about April 25, 2022, at approximately 1:02 p.m., the **MENDEZ PHONE** received an approximately 8-minute incoming telephone call from the **MONTANO PHONE**.

    d.   On or about April 25, 2022, at approximately 2:45 p.m., the **MENDEZ PHONE** was used to make an approximately 2-minute outgoing telephone call to the **MONTANO PHONE**.

    e.   On or about April 26, 2022, at approximately 7:51 p.m., the **MENDEZ PHONE** received an approximately 1-minute incoming telephone call from the **MONTANO PHONE**.

f. On or about April 27, 2022, at approximately 10:32 a.m., the **MENDEZ PHONE** received an approximately 4-minute incoming telephone call from the **MONTANO PHONE**.

g. On or about April 27, 2022, at approximately 10:51 a.m., the **MENDEZ PHONE** received an approximately 4-minute incoming telephone call from the **MONTANO PHONE**.

h. On or about April 27, 2022, at approximately 12:35 p.m., the **MENDEZ PHONE** received an approximately 4-minute incoming telephone call from the **MONTANO PHONE**.

i. On or about April 27, 2022, at approximately 3:06 p.m., the **MENDEZ PHONE** was used to make an approximately 1-minute outgoing telephone call to the **MONTANO PHONE**.

IV. *The August 2023 arrest of CW1 by Joshua MONTANO*

42. On or about September 1, 2023, the FBI received an allegation from a now-cooperating witness, hereinafter referred to as Cooperating Witness #1 (CW1).[18] CW1 has been interviewed multiple times by the FBI.[19] Below is a summary of the information the FBI has gathered from CW1:

---

[18] As described in further detail above, CW1 is cooperating with the FBI. Information provided by CW1 was corroborated through review of relevant documents, review of text messages with Ricardo MENDEZ, and consensually recorded telephone calls with Ricardo MENDEZ. CW1 was promised no favorable treatment or service from the United States Government.

[19] CW1 was provided with a "target letter" which allowed CW1 to obtain appointment of counsel through the United States District Court. CW1 conferred with his federal court-appointed attorney and has agreed to continue cooperating with the government.

43.     On the night of August 25, 2023, and into the morning of August 26, 2023, CW1 was driving and ran out of gas near the intersection of Coors Boulevard and Montano Road in Albuquerque, New Mexico. Two APD vehicles approached CW1's car. Joshua MONTANO was one of the officers. The second officer was not identified. Joshua MONTANO interviewed CW1. CW1 admitted to drinking alcohol. Joshua MONTANO performed a field sobriety test on CW1. Joshua MONTANO then arrested CW1 and transported CW1 to an APD substation for a breathalyzer test.

44.     At the substation, CW1 was given a breathalyzer examination. Joshua MONTANO told CW1 that if CW1 did not blow twice the legal limit, CW1 would not go to jail. Joshua MONTANO said twice the limit would be an aggravated DWI. CW1's breathalyzer results were 0.13 and 0.14. CW1 received a ticket and paperwork for DWI.[20] Joshua MONTANO drove CW1 home. CW1's driver's license was kept by APD.

45.     CW1 told agents that, on or about August 28, 2023, Ricardo MENDEZ called CW1. At the time, CW1 understood Ricardo MENDEZ to be affiliated in some way with the public defender's office. During this call, Ricardo MENDEZ requested to meet with CW1 at a Freddy's Frozen Custard & Steakburgers (Freddy's) located in the vicinity of Coors Boulevard

---

[20] Although CW1 stated that Joshua MONTANO provided him with a ticket, no criminal charges were filed against CW1 at this time. As discussed further herein, Joshua MONTANO did not file the Criminal Complaint until September 11, 2023. In terms of who initiates the filing of these types of charges, based on my training, experience, and familiarity with this investigation, it is the officer who submits the paperwork (the Criminal Complaint) for filing, which initiates the criminal case. If an offender is booked the night of his arrest, the Criminal Complaint is provided to the Metropolitan Detention Center (MDC), along with the booking sheet, at the time of booking. If an offender is not brought to the MDC following his arrest for booking, the officer can later file the Criminal Complaint to initiate criminal charges against him. Because of this process, the Police Department – and not the District Attorney's Office – controls the timing of the initiation of – and whether to initiate – criminal charges following a DWI arrest.

and Central Avenue in Albuquerque, New Mexico. CW1 agreed to the meeting. Agents have reviewed the phone records for the **MENDEZ PHONE**, and the records reflect a phone call from the **MENDEZ PHONE** to CW1, on August 28, 2023, at 12:36 p.m. Based on my training, experience, and familiarity with this investigation, I believe Ricardo MENDEZ made this call to arrange a meeting with CW1 to discuss the scheme of soliciting payment from CW1 in exchange for Joshua Montano improperly interfering with the Criminal Complaint against CW1.

46.    Later that day, on or about August 28, 2023, CW1 met with Ricardo MENDEZ at Freddy's. Prior to the meeting, Ricardo MENDEZ used the **MENDEZ PHONE** to communicate via text message with CW1 concerning what vehicle CW1 would be arriving in.[21] Below are the messages between CW1 and Ricardo MENDEZ (RM):

**RM:**    What are you driving

**CW1:**   I'm almost there I'm in a blue 2020 Volvo

**CW1:**   I'm here

**RM:**    B there in a bit

**CW1:**   *[ok hand emoji]*

**RM:**    Just pulled up

**RM:**    Little wagon

**RM:**    ?

**CW1:**   Yes

---

[21] CW1 provided consent for FBI agents to take photographs of text messages between CW1 and the **MENDEZ PHONE**.

47.     Based on my training, experience, and familiarity with this investigation, I believe that Ricardo MENDEZ and CW1 were discussing the location and arrival for the meeting in the Freddy's parking lot.  At some point during the meeting, Ricardo MENDEZ produced CW1's driver's license. Ricardo MENDEZ told CW1 that he could make CW1's charges go away, and would return CW1's driver's license, if CW1 paid Ricardo MENDEZ $6,000. Ricardo MENDEZ emphasized he would not return CW1's driver's license until CW1 paid Ricardo MENDEZ. CW1 asked Ricardo MENDEZ how specifically Ricardo MENDEZ would make the charges go away. Ricardo MENDEZ did not answer CW1's question. Instead, Ricardo MENDEZ said CW1 had until Wednesday, August 30, 2023, to pay the $6,000. Ricardo MENDEZ explained that he would normally give someone in CW1's position until a Friday to pay, but because it was Labor Day week, CW1 would have to pay by Wednesday.

48.     After meeting with Ricardo MENDEZ, CW1 described the interaction with Ricardo MENDEZ to a friend. CW1 and the friend both agreed the situation was weird. The two subsequently called Ricardo MENDEZ and attempted unsuccessfully to record the conversation. During the phone call, Ricardo MENDEZ told CW1 that the $6,000 payment had to be in cash. Agents have reviewed the phone records for the **MENDEZ PHONE**, and the records reflect a phone call from CW1 to the **MENDEZ PHONE**, on August 28, 2023, at 6:47 p.m.

49.     CW1 began cooperating with the FBI on or about September 1, 2023. CW1 described being motivated to work with the FBI out of a desire to see justice served.

50.     On or about September 5, 2023, at approximately 1:38 p.m., CW1 had a consensually recorded telephone call with Ricardo MENDEZ (using the **MENDEZ PHONE**).

This call was made in the presence of agents and has been confirmed by review of phone records for MENDEZ PHONE. Below is a transcription of the call:

**CW1:** Hi this is [CW1]. You know I'm I've been real worried about this ticket. And all this sh- crap going on. Is this am I still able to give you some money for it or what?

**RM:** Uh so remind me what ticket it was. I'm sorry.

**CW1:** It was uh [CW1]. It was um for the ticket that I got on last Saturday. The 27th. 26th.

**RM:** What was the ticket for though?

**CW1:** DWI

**RM:** Ok

**CW1:** We met at Freddy's

**RM:** Oh. Yeah man that all went up.

**CW1:** That all went up?

**RM:** It's- yeah.

**CW1:** Ok.

**RM:** You remember I told you to call me because I was leaving out of town Thursday at my desk. And I got back this morning at 3:30

**CW1:** Ok so there's nothing we can do then.

**RM:** Oh I can still I can still help you but as far as uh I mean they're gonna file. You could've beat it you know before it went before it got filed.

**CW1:** Oh ok.

**RM:** I mean we can still beat it but you're gonna wind up paying more now.

**CW1:** Oh I'm gonna end up being paying more now? Uh what do you mean? What do you mean?

**RM:** Well it wasn't filed. Nothing had been filed.

**CW1:** Ok

19

**RM:** I mean let me find out. I I like I said I took and I haven't been back. I got back this morning.

**CW1:** Ok

**RM:** Um I'll call you back.

**CW1:** Ok

51.     Based on my training, experience, and familiarity with this investigation, when Ricardo MENDEZ told CW1 "You could've beat it you know before it went before it got filed," I believe that Ricardo MENDEZ was suggesting that Ricardo MENDEZ and Joshua MONTANO could have improperly prevented the filing of charges in exchange for the $6,000 payment Ricardo MENDEZ was requesting from CW1.

52.     A review of toll records for the **MENDEZ PHONE** revealed that on or about September 5, 2023, at approximately 1:40 p.m. - which was almost immediately after the conclusion of the above telephone call -  the **MENDEZ PHONE** made a telephone call to the **MONTANO PHONE** which lasted approximately 47 seconds. Based on my training and experience, and the proximity in time to the communications with CW1, I believe that these calls were in reference to the communications Ricardo MENDEZ had with CW1, and the scheme to ensure that, in exchange for payment, MONTANO improperly delayed filing or failed to file a criminal complaint. Taken together, I believe that when Ricardo MENDEZ said to CW1, "You could've beat it you know before it went before it got filed," Ricardo MENDEZ was telling CW1 that CW1's payment of money would have prevented criminal charges from being filed against CW1. In my training and experience, there would not be a lawful basis where payment to a defense attorney employee would prevent the filing of criminal charges unless it was a diversionary

20

resolution negotiated with the prosecuting authority (in this case, the Second Judicial District Attorney's Office). When Ricardo MENDEZ said, "I mean we can still beat it but you're gonna wind up paying more now," and then discussed the status of whether the charges had been filed, I believe Ricardo MENDEZ was telling CW1 that if the charges had been filed, Ricardo MENDEZ could still arrange for the charges to be dismissed, but CW1 would have to pay more.

53.    On or about September 5, 2023, at approximately 2:04 p.m., CW1 had a consensually recorded telephone call with Ricardo MENDEZ (on the **MENDEZ PHONE**). This call was made in the presence of agents and has been confirmed by review of phone records for the **MENDEZ PHONE**. Below is a transcription of the call:

**CW1:** Hey Ricardo.

**RM:**  I'll find out for you uh tonight or tomorrow.

**CW1:** You'll find out for me tonight or tomorrow?

**RM:**  Yeah

**CW1:** Ok

**RM:**  So were you ready to that or what?

**CW1:** So I can come up with some of the money. I came up with 36. Um

**RM:**  Yeah no.

**CW1:** How much. How much-

**RM:**  I told you

**CW1:** Can I can you some?

**RM:**  All of it up front

**CW1:** Um 6,000?

21

**RM:**  Mmhmm

**CW1:** Ok. Ok um let me see what I can do then

**RM:**  See yeah that's what we talked about last week

**CW1:** Ok

**RM:**  So if eh. Are you gonna be able to do that because I'm can't tell him to uh hold-

**CW1:** Yes

**RM:**  Yeah because I don't want to be responsible for that money

**CW1:** Yeah. So how would I get it to you?

**RM:**  Uh uh are you gonna be able to get that money?

**CW1:** Yes. Yes.

**RM:**  Like tonight? Tomorrow morning?

**CW1:** Tomorrow morning. That way-

**RM:**  Hello?

**CW1:** That way I can get ahold of my um my uncle and he can give me the rest of the money.

**RM:**  Yeah but that's what you told me last week

**CW1:** Well yeah that's cause he was out of town just like you were out of town for Labor Day

**RM:**  Yeah let me know tonight cause I'm gonna I'm gonna ask him to do something if you can't do it

**CW1:** Ok. Ok so I'll let you know tonight.

**RM:**  Alright.

**CW1:** Ok.

54. When Ricardo MENDEZ asked CW1, "Are you gonna be able to do that because I'm can't tell him to uh hold-," I believe Ricardo MENDEZ was indicating that the payment of money by CW1 would allow Ricardo MENDEZ to tell Joshua MONTANO to not file the criminal charges against CW1. In my training and experience, there would be no lawful basis for such an arrangement. When Ricardo MENDEZ told CW1, "I'm gonna ask him to do something if you can't do it," I believe that Ricardo MENDEZ was saying that Joshua MONTANO would file the criminal charges if CW1 did not pay the money.

55. A review of telephone toll data for the **MENDEZ PHONE** revealed that on or about September 5, 2023, beginning at approximately 2:07 p.m. – which was minutes after the conclusion of the above telephone call – and continuing until approximately 5:17 p.m., the **MENDEZ PHONE** communicated via SMS text message with the **MONTANO PHONE** approximately six (6) times. The timing of these text messages in relation to the previous telephone call between Ricardo MENDEZ and CW1, when viewed in combination with the fact that Joshua MONTANO was the arresting officer in the matter being discussed above, lead me to believe that Ricardo MENDEZ and Joshua MONTANO were communicating about the scheme to have CW1 pay money in exchange for CW1's criminal charges not being filed.

56. On or about September 5, 2023, at approximately 5:49 PM, CW1 had a consensually recorded telephone call with Ricardo MENDEZ (using the **MENDEZ PHONE**). This call was made in the presence of agents and has been confirmed by review of phone records for MENDEZ PHONE. Below is a transcription of the call:

**CW1:** Hey Ricardo.

**RM:**  Yes sir.

**CW1:**  Yeah this is [CW1] again.

**RM:**  Yes.

**CW1:**  Um so um. I believe I'm going to be able to get all the money. Um so if I'm gonna give you this the six thousand…how how am I going to be sure this is just gonna go away.

**RM:**  What ha- what has what has happened since when I met you.

**CW1:**  Uh nothing so far.

**RM:**  Exactly.

**CW1:**  Ok. Alright. Alright so if um…so I I'm I'll be able to get most of the money um is there any way that I can um get you's most of the money and then I can give you the rest by Friday. Cause I just want to make sure this is gonna go away. And I'm I'm I'm like um

**RM:**  You're playing with fire.

**CW1:**  I'm sorry?

**RM:**  I said you're playing with fire. Be careful. Um uh uh it's not in my control

**CW1:**  Ok. It's out of your contr- ok.

**RM:**  Yeah. Uh I mean I I held it off.

**CW1:**  Ok.

**RM:**  But uh you know if it go it it's not in my control.

**CW1:**  Alright.

**RM:**  As I told you I mean if you If you have friends or family or anybody that could help.

**CW1:**  Yeah that's what I'm…I've got most of the money but they a lot of them are still coming into town and I'm trying to get more money in and I I can get most of it in

**RM:**  How much is most of it?

24

CW1: Most of it is like 3600 right now.

RM:   Eh

CW1: I got that. I'm gonna get more. I'm just waiting for it to come in.

RM:   Yeah that's not on me sir.

CW1: What was that?

RM:   I said it's not on me.

CW1: It's not.

RM:   Keep keep me uh posted uh uh I'll call and let them know.

CW1: Ok.

RM:   Alright. Mm bye.

CW1: Mm.

57.    In this call, CW1 asked, "how am I going to be sure this is just gonna go away." In response, Ricardo MENDEZ said, "what has what has happened since when I met you." When CW1 said "nothing," Ricardo MENDEZ responded by saying, "Exactly." In my training and experience, I believe that Ricardo MENDEZ was indicating to CW1 that CW1's relationship with Ricardo MENDEZ, and MENDEZ's relationship with Albuquerque Police Officers, was the reason that criminal charges had not yet been filed against CW1. When Ricardo MENDEZ later told CW1 that "You're playing with fire," I believe Ricardo MENDEZ was telling CW1 that if the full amount of money was not paid by CW1, then CW1 was at risk of the criminal charges being filed. When Ricardo MENDEZ said, "Yeah. Uh I mean I I held it off," I believe that Ricardo MENDEZ was confirming for CW1 that Ricardo MENDEZ was the reason that criminal charges had not been filed against CW1. In my training and experience, there is no legitimate reason that

a defense attorney's employee would have the ability to "hold off" criminal charges for a potential client.

58.    On or about September 5, 2023, at approximately 6:25 p.m.,[22] CW1 sent a text message to the **MENDEZ PHONE** which read, "Hello, this is [CW1] any updates." A review of telephone toll data for the **MENDEZ PHONE** revealed that minutes later, between approximately 6:27 p.m. and 6:32 p.m., the **MENDEZ PHONE** communicated with the **MONTANO PHONE** via SMS text message approximately three (3) times. The timing of these text messages in relation to the previous telephone call between Ricardo MENDEZ and CW1, when viewed in combination with the fact that Joshua MONTANO was the arresting officer in the matter being discussed above, indicates to me that Ricardo MENDEZ and Joshua MONTANO were likely continuing to communicate about the scheme to have CW1 pay money in exchange for CW1's criminal charge not being filed.

59.    On or about September 6, 2023, at approximately 12:33 p.m., CW1 had a consensually recorded telephone call with Ricardo MENDEZ (using the **MENDEZ PHONE**). This call was made in the presence of agents and has been confirmed by review of phone records for the **MENDEZ PHONE**. Below is a transcription of the call:

**CW1:**  Hello Ricardo.

**RM:**  Yes.

---

[22] A photograph of text message sent by CW1 indicates the text message was sent at approximately 6:25 p.m., however, subpoenaed toll records reflect an approximate time of 5:25 p.m. Agents believe that the difference in time on the toll records is based on the toll records referring to a different time zone. Agents believe that the times listed above are correct for Mountain Standard Time.

**CW1:** Hi this is [CW1] again. Wondering if you heard anything back. If the money that I have will work until F- I get more money or cause I need to get this fixed.

**RM:** Now you weren't able to raise the money?

**CW1:** Um I've got about 38. I almost have it all.

**RM:** Um uh you know what let me try calling again and I'll call you back.

**CW1:** Ok.

60.     Based on my training, experience, and familiarity with this investigation, I believe that CW1 was asking if Ricardo MENDEZ had heard back from Joshua MONTANO about whether Joshua MONTANO had filed the Criminal Complaint, and Ricardo MENDEZ told CW1 he would try calling Joshua MONTANO again to find out. Based on my training and experience, and the proximity in time of the actions, when Ricardo MENDEZ said he would "try calling again," he was referring to calling Joshua MONTANO. A review of telephone toll data for the **MENDEZ PHONE** revealed that later that day, on or about September 6, 2023, at approximately 3:55 p.m., the **MENDEZ PHONE** communicated via SMS text message with the **MONTANO PHONE** approximately one (1) time. Based on my training, experience, and familiarity with this investigation, there is probable cause to believe that, in this text message, Ricardo MENDEZ reached out to Joshua MONTANO to discuss the status of CW1's case. Later that same day, at approximately 4:50 p.m., the **MENDEZ PHONE** made a telephone call to the **MONTANO PHONE** that lasted approximately six minutes and 38 seconds in duration. Moreover, based on my training, experience, and familiarity with this investigation, there is probable cause to believe that Ricardo MENDEZ and Joshua MONTANO may have discussed the status of CW1's case during this phone call.

61.     On or about September 7, 2023, at approximately 10:33 a.m., the **MENDEZ PHONE** sent an SMS text message to the **MONTANO PHONE**. Shortly thereafter, at approximately 11:37 a.m., the **MENDEZ PHONE** made a telephone call to the **MONTANO PHONE** that lasted approximately five minutes and 49 seconds. Then, between 11:02 a.m. and 11:33 a.m., the **MENDEZ PHONE** communicated via SMS text message with the **MONTANO PHONE** approximately eight (8) times. Based on my training, experience, and familiarity with this investigation, I believe that Ricardo MENDEZ and Joshua MONTANO were discussing the status of CW1's criminal case and CW1's efforts to secure money to pay Ricardo MENDEZ.

62.     On or about September 7, 2023, at approximately 1:00 p.m., CW1 had a consensually recorded telephone call with Ricardo MENDEZ (using the **MENDEZ PHONE**). This call was made in the presence of agents and has been confirmed by review of phone records for the **MENDEZ PHONE**. Below is a transcription of the call:

**CW1:** Ricardo this is [CW1] I'm calling about the

**RM:** *Unintelligible (UI)*

**CW1:** Huh?

**RM:** Yes sir

**CW1:** I'm calling to see if we can get this settled. Um-

**RM:** Ok.

**CW1:** If I uh I think I can get all the money. I got all the money together. Um I just want to get this done. I can't sleep. I'm like freaking out because I'm afraid I'm gonna lose my job.

**RM:** Yeah. Yeah uh so you were able to do that now.

**CW1:** Yeah

**RM:** Alright um and you want to do it in the evening?

**CW1:** Sure

**RM:** Ok. Call um you after 5 after 6. Something like that.

**CW1:** Ok

**RM:** Alrighty then

**CW1:** Alright. Thanks.

63.    When CW1 said to Ricardo MENDEZ, "If I uh I think I can get all the money. I got all the money together," based on my training, experience, and familiarity with this investigation, there is probable cause to believe that CW1 was discussing collecting money to pay Ricardo MENDEZ. When CW1 stated he "just want[ed] to get this done," based on my training, experience, and familiarity with this investigation, there is probable cause to believe that, at the direction of agents, CW1 was referring to paying Ricardo MENDEZ money to try to resolve his DWI arrest. When CW1 stated, "I'm like freaking out because I'm afraid I'm gonna lose my job," based on my training, experience, and familiarity with this investigation, there is probable cause to believe that CW1 was conveying to Ricardo MENDEZ their concern that CW1 could lose their job if convicted of DWI. Based on my training, experience, and familiarity with this investigation, in this case, CW1 and Ricardo MENDEZ then arranged a time to discuss CW1's payment of money to Ricardo MENDEZ.

64.    A review of telephone toll data for the **MENDEZ PHONE** revealed that on or about September 7, 2023, from approximately 4:04 p.m. to 4:21 p.m., the **MENDEZ PHONE** communicated via SMS text message with the **MONTANO PHONE** approximately two (2) times. Based on my training, experience, and familiarity with this investigation, there is probable

cause to believe that Ricardo MENDEZ was providing Joshua MONTANO an update on CW1 wanting to discuss the status of his case.

65.     On or about September 7, 2023, beginning at approximately 4:59 p.m., CW1 communicated with Ricardo MENDEZ via SMS text messages sent and received from the **MENDEZ PHONE**. Agents have reviewed this text message exchange between CW1 and the **MENDEZ PHONE**, and the text messages have been confirmed by review of phone records for the **MENDEZ PHONE**. Below are the text messages:

**CW1:** Hello this is [CW1] is still on.

**RM:** I'm still working Whenever I leave I will call you

**CW1:** Ok

**CW1:** Any idea on time I'm needing to pick up my mom from my sisters house?

**RM:** Do whatever you have to do I just got home & I'm waiting

**CW1:** Ok should it text when done?

**RM:** Are u ready?

**CW1:** Yes just got back

**RM:** I meant Do u have everything already?

**CW1:** yes I have the cash

**CW1:** ?

**RM:** hang tight

**CW1:** Ok

**RM:** I'm on the phone

**CW1:** Ok

**CW1:** Hey can we do this tomorrow I've been up early and I need to get to sleep early day tomorrow.

66.     Based on my training, experience, and familiarity with this investigation, there is probable cause to believe that when Ricardo MENDEZ asked CW1 via SMS message, "Are u ready?" and CW1 said, "Yes just got back," that Ricardo MENDEZ was not asking if CW1 was ready to meet and was instead asking if CW1 had the required amount of cash to make the entire payment, which he clarified by sending an SMS message to CW1 that said, "I meant Do u have everything already?" When Ricardo MENDEZ referred to "everything" and CW1 responded, "yes I have the cash," and Ricardo MENDEZ directed him to "hang tight," based on my training, experience, and familiarity with this investigation, there is probable cause to believe that Ricardo MENDEZ understood that CW1 possessed the required amount of cash to make the full payment that would lead to Joshua MONTANO not filing DWI charges against CW1.

67.     Between on or about September 7, 2023, and on or about September 9, 2023, CW1 and Ricardo MENDEZ attempted numerous times, unsuccessfully, to re-establish contact with one another. By way of example, on or about September 7, 2023, at approximately 8:54 p.m. and again at 8:58 p.m., the **MENDEZ PHONE** attempted to call CW1 two times. The next morning, on or about September 8, 2023, at approximately 8:42 a.m., CW1 sent Ricardo MENDEZ a text message that read, "sorry, I didn't answer your phone call last night. I fell asleep." I am aware that September 9, 2023, was a Saturday.

68.     Certain communications between the **MENDEZ PHONE** and the **MONTANO PHONE** during and after this time lead me to believe that Ricardo MENDEZ was likely telling Joshua MONTANO that the money was not going to be paid and to go ahead and file the charges against CW1:

31

a.      On or about September 7, 2023, the **MENDEZ PHONE** sent two (2) text messages to the **MONTANO PHONE** (one at approximately 8:54 p.m. and another at 8:58 p.m.). Later that same day, the **MONTANO PHONE** sent one (1) text message to the **MENDEZ PHONE** at 9:06 p.m.

b.      On or about September 7, 2023, the **MENDEZ PHONE** called CW1 two (2) times (once at approximately 8:49 p.m. and a second time at approximately 8:51 p.m.). Thereafter, at approximately 9:07 p.m., the **MENDEZ PHONE** called the **MONTANO PHONE**. The call lasted approximately 97 seconds.

c.      On or about September 8, 2023, the **MENDEZ PHONE** and the **MONTANO PHONE** spoke telephonically. The phone call lasted approximately 280 seconds.

d.      From on or about September 8, 2023, to on or about September 12, 2023, there were approximately 27 text messages between the **MENDEZ PHONE** and the **MONTANO PHONE** (including 16 text messages from the **MONTANO PHONE** to the **MENDEZ PHONE** and approximately 11 text messages from the **MENDEZ PHONE** to the **MONTANO PHONE**).

69.     On or about September 8, 2023, at approximately 8:42 a.m., CW1 communicated with Ricardo MENDEZ via SMS text messages sent to the **MENDEZ PHONE**. Below are the text messages (which were later photographed by the FBI):

**CW1:** sorry, I didn't answer your phone call last night. I fell asleep

**CW1:** Can we get this done please. I am trying to get this go [sic]

70.     Court records shows that on Monday, September 11, 2023, a Criminal Complaint was filed against CW1. The Criminal Complaint showed the arresting officer as Joshua MONTANO and the basis of the Criminal Complaint was the traffic stop conducted of CW1 on August 26, 2023. Based on my conversations with APD internal affairs, most DWI arrests are booked into custody following their arrest and the Criminal Complaint is filed at that time. In some instances, Criminal Complaints are filed at a later time, but that is less common. If the Criminal Complaint is filed at a later date (which then triggers having the defendant appear on a summons), the average amount of time between arrest and the filing of a Criminal Complaint is within one week.

71.     On or about October 6, 2023, the FBI asked CW1 to re-establish contact with Ricardo MENDEZ. That same date, at approximately 3:36 p.m., CW1 sent two text messages via SMS to the **MENDEZ PHONE**. Below are the text messages:

**CW1:** Hello I really need your help my date is coming up next week I drive a company truck I really can't lose my job I take care of my mother. Is there anyway we can take care of this still.

**CW1:** I've reached out for assistance and it's going to cost me the same if not more and not sure this will be gone and you promised for it to go away

72.     Soon thereafter, on or about October 6, 2023, at approximately 6:25 p.m., the **MENDEZ PHONE** called the **MONTANO PHONE**. The phone call lasted approximately two minutes and 14 seconds. Based on my training, experience, and familiarity of this investigation, there is probable cause to believe that Ricardo MENDEZ and Joshua MONTANO discussed CW1's re-initiation of contact with Ricardo MENDEZ to discuss the status of CW1's case.

73.    On or about October 10, 2023, the **MENDEZ PHONE** replied to CW1. Beginning at approximately 8:22 p.m., CW1 exchanged a series of SMS text messages with the **MENDEZ PHONE**. Below are the text messages:

**RM:**  I'm available tomorrow afternoon I can text you after court

**CW1:**  Hey just hoping you can still help me out my arraignment hearing is coming up and I'm freaking out

**RM:**  I should be done by 2 or 230pm You shouldn't have procrastinated

**CW1:**  I had the money anything we can do Sdo [sic] I call you tomorrow?

**RM:**  I will reach out after court

**CW1:**  Ok

74.    Based on my training, experience, and familiarity with this investigation, there is probable cause to believe that, in this text message exchange, CW1 is asking for help from Ricardo MENDEZ in resolving his DWI case. When Ricardo MENDEZ stated, "You shouldn't have procrastinated," based on my training, experience, and familiarity with this investigation, there is probable cause to believe that Ricardo MENDEZ was likely referring to CW1 not paying the full amount to Ricardo MENDEZ earlier so that charges would not have been filed.

75.    Less than an hour later, on or about October 10, 2023, at approximately 8:31 p.m., the **MENDEZ PHONE** sent a text message to the **MONTANO PHONE**. Then, at approximately 9:02 p.m., the **MONTANO PHONE** responded to the message, and at approximately 9:04 p.m., the **MENDEZ PHONE** replied to the **MONTANO PHONE**. Based on my training, experience, and familiarity of this investigation, there is reason to believe that Ricardo MENDEZ and Joshua MONTANO discussed CW1 request to discuss payment.

76.    On or about October 11, 2023, CW1 exchanged a series of SMS text messages with the **MENDEZ PHONE**. Below are the text messages:

34

**CW1:** I don't want to miss you call again because I'm at work

**CW1:** Sorry to bug

**RM:**   7112 aztec road ne 87110 Located in a residential area 415pm

77.      On or about October 11, 2023, at approximately 4:15 p.m., CW1 had a consensually recorded meeting with Ricardo MENDEZ at the law office of Clear & Clear. Below is a partial transcript of the conversation between Ricardo MENDEZ and CW1:

**CW1:** I never got in trouble before. I started freaking out so bad that I, my, I need my job. I can't afford to -to…

**RM:**   So, this…(voices overlap)

**CW1:** …lose my license.

**RM:**   …this, so it's a- it's already been filed.

**CW1:** Okay.

**RM:**   It's already in the court system. And if you'd of done it when I told you to, it wouldn't have gone through the court system. None of this woulda happened.

**CW1:** Mmm hmm.

**RM:**   It would've been done and over with. So, that's why I told you, we don't do any (UI) crime. We don't have to do anything, and I was gonna be (UI). Otherwise it was gonna be more. So… I you was saying you s- you saw a bunch of different attorneys. Not and I told you this when I met you, nobody's gonna be able to guarantee you could get rid of this. Uh, uh so having said that, I mean, what we charge for a DWI, when it comes in here is eighty five hundred. That's not, that's not a guarantee. You want a guarantee completely get out of it, it's gonna be ten grand. Or, or, or, or more, but… it, cause it's in the system now.

**CW1:** Yeah.

**RM:**   …and you wouldn't, and you wouldn't of had anything, you would've had your license, would've been fine.

**CW1:** See man I was just a-I was just afraid because I didn't know how it was gonna work out. I didn't know if you were gonna ask for money b-more money later. Or what, what was going on.

**RM:**  You sh-you should've looked us up. You would've seen that, dang this guy's legit.

**CW1:**  Uh huh.

**RM:**  I mean…it's a legitimate business. I mean this is all we do is criminal defense. So, now we're stuck like we're gonna have to do the whole case if you want us to do anything. Um but it's gonna cost you twice as much.

**CW1:**  Shit.

**RM:**  Now I'll, I'll, I'll work with you in payments, but it's the same thing. You're s-you're still gonna have to come up with a great majority upfront.

**CW1:**  Mmm hmm. At least five thousand.

**RM:**  No about say sixty five (UI, voices overlap)

**CW1:**  About fifty five?

**RM:**  And then I'll do the rest up in payments…

**CW1:**  (UI).

**RM:**  …for you. But the, you know, we've gotta have it paid off in three to four months.

**CW1:**  Yeah. Shit.

**RM:**  Same thing though…

**CW1:**  Yeah.

**RM:**  …it'll be completely off there.

**CW1:**  It'll be completely off.

**RM:**  It's just a slow process. You're gonna have, it's gonna have to take its course. But, you won't have to worry about anything. The MVD[23] hearing is set for next month.

**CW1:**  It's set for, it's set for next month? Okay, cause I haven't received any paperwork, anything on that yet either.

**RM:**  Yeah.

---

[23] Based on the context of this comment, I believe that MVD stands for the New Mexico Motor Vehicle Division.

**CW1:** Okay.

**RM:** Well this is what I do.

**CW1:** Yeah.

**RM:** This is what I do all day long. I know uh where everything's, you know… what's going on.

**CW1:** Okay. Well let me work on getting the money together. I know I had already talked to my uncle, he still has that money saved for me. So let me talk with him and see what I can do. Because I'm like, like you said, I just wanna make sure that it's… I don't have to deal with it.

**RM:** Yeah. You won't have to. I mean but… you just, you just, you, you just shouldn't of waited.

**CW1:** Yeah, well I was, I, I, I was freaking out like I said and then I worked, like I say, I, I travel when I work, I drive, so I was out of town for a couple of weeks.

**RM:** (sighs) Yeah but it was over, almost two months ago.

**CW1:** Yeah. Shit.

**RM:** I mean y-you could go to any attorney in the state and nobody's gonna guarantee you off.

**CW1:** Mmm hmm.

**RM:** They can't.

**CW1:** Okay. And you can, you can guarantee?

**RM:** This is what we do.

**CW1:** Okay. Well let me see what, let me get my shit together…

**RM:** So tomorrow, what you're gonna have to do is you're gonna have to uh call in…

**CW1:** Uh huh.

**RM:** …and uh and just plead not guilty, and say give me, give me some time to get an attorney.

37

**CW1:** Okay.

**RM:** And, and they'll give you two weeks to get an attorney.

**CW1:** Okay.

**RM:** If you go try to get a public defender or get another attorney, there's, there, I know there's some cheap ones out there.

**CW1:** Yeah.

**RM:** You know there's, there's attorneys that are good and real cheap. I, I tell everybody the people who come to us are the ones that need to get off. You know what I mean? If you don't need to get off, don't come to us. That's what those attorneys out there are for, you know, a few thousand, three or four thousand, they'll tell you maybe. Uh but if you need to get off, th-this is where you come.

**CW1:** And you can guarantee it? Okay. Okay. Alright, let me see what I can do then.

**RM:** Yeah and, and, and like I said if you do, if we roll this way, I'm gonna tell you to stop worrying.

**CW1:** Okay.

**RM:** Don't even think about this. It's done.

**CW1:** Okay. Okay.

**RM:** Yeah, tomorrow's no biggie. Tomorrow you call in and you say I'm pleading not guilty. They're gonna read-give the charges. The charge is DWI first offense. You're potentially facing up to ninety days in jail, one year r-revocation of your license, one year um uh probation, uh and uh forty eight hours community service, three hours of victim (UI) panel, um twelve hours of DWI school, um up to fifteen hundred dollars in fines and fees, um… and court costs, what else, let's see…

**CW1:** Damn, I don't have time for (laughs)…

**RM:** Yeah, that's, I mean…

**CW1:** Yeah.

**RM:** That's if you roll the dice.

**CW1:** Okay.

**RM:**    But you don't need to roll the dice.

**CW1:**    Yeah. Okay. Okay. So I'll make that phone call tomorrow and then um I'll uh start working on the rest of that money and then I'll get a hold of you. See what I can do.

**RM:**    And let's see what our schedule looks like tomorrow… (pause) So I should be done by three o'clock so uh you could call me or text me or, you know if you wanna just (UI) for tomorrow. Uh it's up to you.

**CW1:**    Let me, let me give you a call. Let me text you.

**RM:**    (speaks soft) Okay.

**CW1:**    Okay. Bueno. Shit. (UI) right to my friend's house.

**RM:**    What's that?

**CW1:**    (laughs) (UI) might be at my friend's house a little bit. (laughs)

**RM:**    Yeah, nobody lives here. This is just our office.

**CW1:**    Oh. Oh wow. Very nice. Okay. (background noise) Gracias, and I'll get a hold of you. Fuck, fuck, fuck, fuck. (background noise/bell sound/engine starts) (01:17) I'll be there on Monday, probably around… ten o'clock. If they wanna start, that's fine. If they can be there at ten o'clock, that would be great.

78.    When Ricardo MENDEZ said, "And if you'd of done it when I told you too, it wouldn't have gone through the court system. None of this woulda happened," I believe Ricardo MENDEZ was telling CW1 that if CW1 had paid the money sooner, Ricardo MENDEZ could have prevented the criminal charges from being filed against CW1. When Ricardo MENDEZ said, "I mean, what we charge for a DWI, when it comes in here is eighty five hundred. That's not, that's not a guarantee. You want a guarantee completely get out of it, it's gonna be ten grand. Or, or, or, or more, but… it, cause it's in the system now," I believe Ricardo MENDEZ was telling CW1 that a higher price is charged for a "guarantee." In my training, experience, and knowledge of the investigation, I believe that Ricardo MENDEZ was using the word "guarantee" as a

shorthand way of telling CW1 that CW1's payment of money to Ricardo MENDEZ would assure a favorable outcome of CW1's charges based on an improper method.

79.    Ricardo MENDEZ told CW1, "you could go to any attorney in the state and nobody's gonna guarantee you off" and CW1 responded by asking, "And you can, you can guarantee?" Ricardo MENDEZ answering by saying, "This is what we do." When taken together with the other information known, I believe that when Ricardo MENDEZ said, "This is what we do," I believe that Ricardo MENDEZ was confirming for CW1 that Ricardo MENDEZ had the ability to do something that other criminal defense law firms could not do, which was to assure that CW1's criminal charges were improperly dismissed in exchange for CW1's payment of money.

80.    A review of telephone toll data for the **MENDEZ PHONE** revealed that on or about October 11, 2023, at approximately 4:08 p.m. to 4:21 p.m., the **MENDEZ PHONE** communicated via SMS text message with the **MONTANO PHONE** approximately two (2) times. On or about October 11, 2023, at approximately 4:25 p.m., the **MENDEZ PHONE** made a telephone call to the **MONTANO PHONE** that lasted approximately 90 seconds. While it is unknown what was discussed, the timing of these text messages and subsequent phone call in relation to the consensually monitored meeting between Ricardo MENDEZ and CW1, when viewed in combination with the fact that Joshua MONTANO was the arresting officer in the matter being discussed above, lead me to believe that Ricardo MENDEZ and Joshua MONTANO were using both the **MENDEZ PHONE** and the **MONTANO PHONE** to continue their communications about the scheme to have CW1 pay money in exchange for CW1's criminal charges being dismissed.

81.     Later that night, at approximately 11:22 p.m., CW1 sent a text message via SMS to the **MENDEZ PHONE** that read, "That's a lot of moneys 100% guaranteeing off , How ?" Ricardo MENDEZ did not respond to the message.

82.     On or about October 13, 2023, CW1 communicated with the **MENDEZ PHONE** via SMS text messages sent and received from the **MENDEZ PHONE**. Below are the text messages:

**RM:**   Good morning We are available at 3pm today if you are ready

**CW1:**  Just want to make sure just like expressed in my last text.

No further communications were had between CW1 and Ricardo MENDEZ that day and a meeting between CW1 and Ricardo MENDEZ did not happen at that time.

83.     On or about November 2, 2023, at approximately 4:45 p.m., at the direction of agents, CW1 met with Ricardo MENDEZ at the law office of Thomas J. Clear III located at 7112 Aztec Road NE, Albuquerque, New Mexico, 87110. CW1 paid MENDEZ $6,500 in cash.[24] Clear was not present for this meeting with CW1. The money was United States government money provided to CW1 by the FBI in order to make the payment.

84.     During the meeting, which was consensually recorded, Ricardo MENDEZ told CW1 that Ricardo MENDEZ would contact CW1 via email and advised that CW1 would not need to attend any court hearings. When CW1 asked how Ricardo MENDEZ could possibly guarantee that the DWI charge would go away, Ricardo MENDEZ indicated that the charge would be dismissed due to a lack of evidence.

---

[24] This money was provided to the CHS by the FBI for purpose of paying MENDEZ the bribe he requested.

85.     Ricardo MENDEZ went on to state that because CW1 took so long to pay Ricardo MENDEZ, thereby resulting in the charges being filed, the process of getting the charges dismissed would now take approximately six (6) months. According to Ricardo MENDEZ, once the DWI got dismissed, Ricardo MENDEZ would file a motion to have CW1's arrest expunged from CW1's record.

86.     Ricardo MENDEZ specifically told CW1, "Well shit. I had your license. You could have taken it […] It wasn't filed. That's the best thing. Shit. You could have walked away with nothing. You know, not even had to risk it […] If you had done it the way I told you, nothing would have showed ever."

87.     CW1 also asked Ricardo MENDEZ how CW1 could get his/her driver's license back. Ricardo MENDEZ told CW1 to go to the Motor Vehicle Department and mislead the agency by omitting any information that CW1 received a DWI, and to lie by stating that CW1 lost his/her driver's license.

88.     Prior to CW1 departing from the meeting, Ricardo MENDEZ requested that CW1 send him any documents CW1 had received related to CW1's New Mexico Motor Vehicle Department hearing for the DWI charge. Ricardo MENDEZ indicated CW1 could either email the documents or drop them off in person.

89.     On or about November 2, 2023, at approximately 7:00 p.m., Special Agents with the FBI Albuquerque Field Office received a telephone call from CW1. CW1 told the FBI that Ricardo MENDEZ called CW1 after the consensually monitored meeting and demanded that CW1 go to the law office to pick up the $6,500 that CW1 had given to Ricardo MENDEZ earlier in the day. According to CW1, Ricardo MENDEZ told CW1 that somebody informed Ricardo MENDEZ that CW1 was having Ricardo MENDEZ investigated and that Ricardo MENDEZ

42

wanted to return the money to CW1. CW1 informed MENDEZ that CW1 had no idea what Ricardo MENDEZ was talking about, but that CW1 would nonetheless make arrangements to retrieve the $6,500 from Ricardo MENDEZ the following day (November 3, 2023). Because the return phone call from Ricardo MENDEZ was unexpected, agents were not present to overhear the conversation between Ricardo MENDEZ and CW1 and no recording was completed.

90.     A review of pen register/trap and trace data from November 2, 2023, for the **MENDEZ PHONE** indicated that at approximately 5:29 p.m. – which was shortly after meeting with CW1 (again, at approximately 4:45 p.m.) - Ricardo MENDEZ placed a call to the **MONTANO PHONE**. The call that lasted 29 seconds. Then, at approximately 5:29 p.m., the **MONTANO PHONE** called the **MENDEZ PHONE**. That phone call lasted approximately 291 seconds. Thereafter, at approximately 5:35 p.m., the **MENDEZ PHONE** called the **MONTANO PHONE** again. The call lasted approximately 134 seconds. Based on my training, experience, and familiarity of this investigation, there is probable cause to believe that, in these calls, Ricardo MENDEZ and Joshua MONTANO discussed Ricardo MENDEZ's concerns about CW1 having MENDEZ investigated.

91.     According to pen register data for the **MENDEZ PHONE**, on or about November 2, 2023, at approximately 6:24 p.m., the **MENDEZ PHONE** called CW1. The call lasted approximately one minute 19 seconds. Based on my training, experience, and familiarity with this investigation, I believe this is the phone call CW1 received from Ricardo MENDEZ complaining that CW1 was having Ricardo MENDEZ investigated. At approximately 6:25 p.m. the **MENDEZ PHONE** called the **MONTANO PHONE** once again. This call lasted approximately two minutes 23 seconds.

43

92.     Later that same evening, on or about November 2, 2023, at approximately 8:17 p.m., the **MENDEZ PHONE** sent a text message to the **MONTANO PHONE**. Thereafter, at approximately 8:50 p.m., the **MONTANO PHONE** called the **MENDEZ PHONE**. The phone call lasted approximately two minutes 7 seconds. That phone call was almost immediately followed up with another phone call at 8:52 p.m., from the **MONTANO PHONE** to the **MENDEZ PHONE**, lasting around two minutes 17 seconds. Based on my training, experience, and familiarity with this investigation, there is probable cause to believe that, in these communications, Ricardo MENDEZ and Joshua MONTANO continued to discuss Ricardo MENDEZ's concerns about CW1 having MENDEZ investigated.

93.     A review of pen register and trap and trace device data for the **MENDEZ PHONE** revealed that the **MENDEZ PHONE** was used to communicate via text message with Thomas Clear numerous times on November 2, 2023, following the communications between the **MENDEZ PHONE** and the **MONTANO PHONE**. Specifically, starting at approximately 10:17 p.m. and 10:24 p.m., the **MENDEZ PHONE** and a cell phone believed to be used by Thomas Clear[25] (505-980-2897, hereinafter "CLEAR PHONE") communicated via text message approximately ten (10) times.

94.     Based on my training, experience, and knowledge of the investigation, I believe this November 2, 2023, phone contact between the **MENDEZ PHONE** and the **MONTANO PHONE** was done for the purpose of communicating about Ricardo MENDEZ's suspicion that he was under investigation and the request Ricardo MENDEZ made to CW1 to retrieve the money.

---

[25] Thomas Clear provided this phone number to CW1 as his cell phone number in an email and has directed CW1 to contact him on this number. Internal database checks also indicate that this phone number is utilized by Thomas Clear.

95.     On or about November 4, 2023, CW1 had a consensually recorded meeting with Ricardo MENDEZ in the parking lot of Freddy's for the purpose of retrieving the $6,500. The FBI conducted physical surveillance of the meeting. During surveillance, the FBI observed an APD marked DWI unit arriving at Freddy's. Consensually monitored footage of the meeting showed Ricardo MENDEZ meeting with CW1 in between the APD marked DWI unit and CW1's vehicle. CW1 later told agents that CW1 observed Ricardo MENDEZ get out of the front passenger seat of the APD police car.

96.     During the meeting, CW1 told Ricardo MENDEZ that CW1 had no idea what Ricardo MENDEZ was talking about, in reference to Ricardo MENDEZ being investigated. Ricardo MENDEZ indicated he had heard CW1 was talking about him with other attorneys. CW1 denied the accusations. Ricardo MENDEZ then went on to tell CW1 that Ricardo MENDEZ could still get CW1 "out of this shithole" and suggested he was the only person who could do so. Ricardo MENDEZ offered to keep the $6,500 and help CW1 but emphasized that he needed to be able to "trust" CW1 and warned CW1 not to "bad mouth" him going forward. Ricardo MENDEZ then told CW1 that CW1 did not have to worry about anything.

97.     After the conclusion of the meeting, CW1 informed the FBI that Ricardo MENDEZ re-entered the APD marked DWI unit. (Ricardo MENDEZ did not return the money to the CW1 during the meeting.) Video recordings of the meeting did not capture Ricardo MENDEZ re-entering the car. Shortly thereafter, the FBI drove by the residence of Ricardo MENDEZ – that is, 412 Judith Lane SW, Albuquerque, New Mexico 87121. An APD marked DWI patrol unit was parked in front of the residence, however, agents were not able to definitively say if it was the same APD vehicle that was present for the meeting with CW1.

98.     On or about November 11, 2023, at approximately 10:30 a.m., CW1 received an email from Thomas Clear. Ricardo MENDEZ was also included as a recipient of the email. The email was titled, "Success at MVD Implied Consent Administrative License Revocation Hearing and Notice of Initial Virtual Pre-Trial Conference." The email read, in relevant part:

> Please be advised that we were successful in our representation of you at the Motor Vehicle Division Administrative Implied Consent License Revocation Hearing help on Thursday, November 9, 2023, at 1:00 p.m. before Administrative Law Judge Irma Gonzales! One down and one to go!! Now we must win the Criminal D.W.I. case.
>
> The Initial Virtual Pre-Trial Conference for your Driving While Intoxicated case will be held on Monday, November 20, 2023, at 9:45 a.m., before the Honorable Renee Torres. The Initial Virtual Pre-Trial Conference will originate from Judge Torres's Courtroom, Sixth Floor, Courtroom #660, Metropolitan Courthouse, 401 Lomas Northwest, but we will be appearing remotely by videoconference. […].
>
> Please call me this coming week, to discuss that will happen at the Initial Virtual Pre-Trial Conference. I can best be reached on my cellular phone at 505-980-2897.

99.     Later that evening, on or about November 11, 2023, at approximately 6:10 p.m., CW1 received a phone call from the CLEAR PHONE. The phone call was not answered. Thereafter, at approximately 6:10 p.m., CW1 received a text message from the CLEAR PHONE that read, "Hello [CW1]: this is Tom Clear, your lawyer … my cell phone is 505-980-2897…please call when you have a minute".

100.    On or about November 12, 2023, CW1 had a consensually recorded telephone call with Thomas Clear. This call was made in the presence of agents. During the phone call, Thomas Clear reiterated what was in the email and confirmed details such as CW1's mailing address. CW1 was instructed to call Thomas Clear instead of Ricardo MENDEZ going forward.

101.    On November 11, 2023, Thomas Clear entered his appearance on behalf of CW1.

46

## V.   Information and allegations concerning Honorio ALBA

102.   After the conclusion of the meeting between CW1 and Ricardo MENDEZ on November 4, 2023, the FBI showed CW1 a photograph of APD Police Officer Honorio ALBA. CW1 stated they were eighty-five percent certain that Honorio ALBA was the driver of the APD police car that transported Ricardo MENDEZ to the meeting.

103.   The marked patrol unit that was observed by the FBI transporting Ricardo MENDEZ to and from the meeting with CW1 was marked as Unit #C91.

104.   On or about November 6, 2023, the FBI conducted physical surveillance at the residence of Honorio ALBA – that is, 68 McCall Loop, Edgewood, NM 87015, and the residence of Joshua MONTANO – that is, 9808 Cameron Street NW, Albuquerque, NM 87114. APD police unit #C91 (bearing New Mexico license plate # 13515G) was observed parked at the residence of Honorio ALBA. APD Internal Affairs confirmed that this unit (#C91) is assigned to Honorio ALBA.

105.   The FBI was aware of Honorio ALBA's potential involvement in the scheme because several months prior, on or about July 3, 2023, a local attorney (hereinafter LA) contacted the United States Attorney's Office for the District of New Mexico with an allegation against two APD police officers. FBI agents interviewed LA, who provided the following information.

106.   LA had a consult with a DWI client, hereinafter referred to as Witness #2 (W2).[26] W2 told LA that W2 had been arrested by APD, breath tested, released and never formally

---

[26] FBI Agents have attempted to speak with W2 through the LA, but, so far, those efforts have not been successful.

charged. Shortly thereafter, W2 received a call from Ricardo MENDEZ, during which Ricardo MENDEZ told W2 that W2 needed to visit Ricardo MENDEZ. W2 agreed to the meeting.

107.    W2 told LA that Ricardo MENDEZ told W2 that the arresting officer was Honorio ALBA and that Honorio ALBA was Ricardo MENDEZ's cousin. As purported proof, Ricardo MENDEZ showed W2 an Instagram picture.

108.    Ricardo MENDEZ then told W2 that if W2 agreed to pay Ricardo MENDEZ $10,000 in cash, there would be no charges filed and no hearing with the New Mexico Motor Vehicles Department (MVD).

109.    A review of toll records for **MENDEZ PHONE** revealed that on September 16, 2022, Ricardo MENDEZ had an approximately eight (8) minute telephone call with a phone number associated with W2.

110.    According to LA, W2 was never formally charged. The FBI conducted a query of court records and could not locate any record of charges ever being filed against W2.[27]

---

[27] If a defendant is convicted of DWI in the State of New Mexico, there are associated fees that the offender must pay to the court as part of his or her judgment and sentence, in addition to any fine that the court may impose. *See* NMSA 1978 §§ 31-12-3, 66-8-102(E)-(J). These fines and fees vary depending on the offender's criminal history (specifically if they had sustained a prior DWI conviction and, if so, how many) and the programming ordered by the state sentencing judge. While the court may allow an offender to perform community service in lieu of payment, if a case is not filed against a DWI offender or if the case is dismissed because of this illegal scheme, the court will not recover the associated fees and fines that would have otherwise attached to the criminal proceedings upon a guilty conviction. These fees are then directed to the state crime laboratory fund, which is directed to use such fees to pay for various costs and expenses by the State, including various expenses associated with DUI, community programs designed to prevent DUI, and other traffic safety purposes. *See id.* NMSA 1978 § 31-12-9 (current version in effect until July 1, 2024).

111. Separately, LA had a consult with a second DWI client, hereinafter referred to as Witness #3 (W3).[28] W3 told LA that W3 had been arrested by APD, breath tested, and not booked. Instead, the arresting officer told W3 they would be contacted.

112. Soon thereafter, Ricardo MENDEZ called W3 and showed W3 a picture of W3's driver's license with an APD uniform visible in the background. Ricardo MENDEZ told W3 that if W3 agreed to pay Ricardo MENDEZ $7,000 in cash, there would be no charges filed and no hearing with the MVD.

113. W3 did not ultimately retain LA. The FBI conducted a query of court records and could not locate any record of charges ever being filed against W3.

114. A review of toll records for the **MENDEZ PHONE** revealed that on June 9, 2023, at approximately 11:36 a.m., the **MENDEZ PHONE** sent a text message to a telephone number associated with W3. Approximately two minutes later, between 11:38 a.m. and 11:55 a.m., the **MENDEZ PHONE** exchanged nine (9) text messages via SMS with the **ALBA PHONE**. Later that day, at approximately 6:31 p.m., Ricardo MENDEZ had an approximately 211 second telephone call with a telephone number associated with W3.

115. A review of toll records for the **MENDEZ PHONE** revealed that on June 12, 2023, at approximately 6:48 p.m., Ricardo MENDEZ had an approximately 42 second telephone call with W3.

---

[28] FBI Agents have attempted to speak with W3 through the LA, but, so far, those efforts have not been successful.

116.    A review of toll records for the **MENDEZ PHONE** revealed that on June 15, 2023, at approximately 3:56 p.m., Ricardo MENDEZ had an approximately 345 second telephone call with W3. Shortly thereafter, at approximately 4:47 p.m., Ricardo MENDEZ had an approximately 1,083 second telephone call with the **ALBA PHONE**.

117.    LA reported that they later called Thomas Clear and confronted Thomas Clear with the allegations made by W2 and W3. According to LA, Thomas Clear acted shocked and denied any knowledge, stating, "I have no idea what you are talking about." LA told Thomas Clear to "put a stop to it," and that Thomas Clear's plausible deniability was gone because he was putting Thomas Clear on notice.

### VI.    The August 24, 2023 arrest of Witness #4 by Honorio ALBA

118.    According to information obtained by the FBI from the City of Albuquerque, Civilian Police Oversight Agency (CPOA),[29] Witness #4 (W4)[30] was arrested by Honorio ALBA

---

[29] CPOA is an independent agency of the City of Albuquerque government, not part of either the City Administration or City Council, that consists of a Civilian Police Oversight Advisory Board and an Administrative Office led by the Civilian Police Oversight Agency Executive Director. CPOA receives, investigates and reviews complaints and commendations submitted by community members for/against the Albuquerque Police Department.

[30] FBI Agents have not yet spoken with W4, so the information contained herein is derived from the materials provided to CPOA.

on or about August 24, 2023, at approximately 1:29 a.m., for DWI, in the vicinity of I-25 and Gibson Blvd. SE.

119.    According to records obtained from the New Mexico Department of Health, Scientific Laboratory Division, a COBRA[31] instrument test record was made by Honorio ALBA for W4 on August 24, 2023, at 2:01 a.m. The test result indicated, "No Sample Introduced." Based on my training and experience, I understand this to mean that W4 likely refused a breath test.

120.    On or about November 3, 2023, the Court Executive Officer for Clerk of Court for the State of New Mexico, Second Judicial District, submitted a complaint on behalf of W4 to CPOA. The complaint stated:

> On behalf of the Second Judicial District Court, I am reaching out to you regarding an APD DWI citation that was issued to [W4]. [W4] is a former employee with the Court and notified us that he was charged with driving while under the influence on around August 24 or 25, 2023. We did not question or conduct any sort of internal investigation however, we have been alerted that there may be questionable conduct by the arresting/citation officer. More specifically, that the arresting/citation officer put [W4] in contact with a specific attorney, possibly named "Rick," who if hired, would ensure that no court case would be filed in court by APD.
>
> While we do not have first-hand knowledge of what communications and actions have taken place, we are reporting this information out of concern.

121.    CPOA opened an internal investigation into these allegations. On or about November 9, 2023, Honorio ALBA was sent a letter notifying him of the administrative investigation, as well as a copy of the complaint. The letter stated, in relevant part:

> [The] Court Executive Officer, Second Judicial District Court, submitted the enclosed Civilian Police Complaint (CPC). Pursuant to City Ordinance, the relevant Albuquerque Police Department SOP, and the APOA Collective Bargaining Agreement, we are providing you this copy. The Executive Director has assigned […] to this case. If an interview is needed, you will

---

[31] COBRA is an acronym meaning Computerized Online Breath Record Archive (COBRA). COBRA data is internal data stored in the machines used to administer the breathalyzer tests. The data is kept by the machines for downloading and review and analysis later.

be contacted at a later date regarding the attached complaint. Your investigator's contact information is [...].

At this time, the relevant SOPs to be reviewed during this investigation include but are not limited to Conduct 1-1 and Reports 2-16. Additional SOPs may be reviewed and addressed during the investigation.

At this time, you are considered a target of this investigation.

Please refer to the Collective Bargaining Agreement and Department SOP governing your rights and responsibilities regarding administrative investigations.

122.    On that same date, November 9, 2023, CPOA conducted a recorded administrative interview of Honorio ALBA via Zoom. Below is a summation of the interview as detailed in CPOA's investigative report:

Officer Alba was interviewed as a target because the investigation determined that he was the *"arresting/citation officer"* referred to in the submitted complaint. Officer Alba was informed and understood that he was a target in the complaint investigation. Officer Alba advised that he received and reviewed the complaint. Officer Alba advised that he had no questions about what he had been directed to do and read the APOA statement into the record.

123.    The FBI obtained a copy of a DWI citation filed by Honorio ALBA for W4. Although dated August 24, 2023, the DWI citation does not appear to have been filed until on or about November 13, 2023 (based on a stamp at the top of the summons) – which was the next business day after Honorio ALBA was notified of the administrative investigation against him and around two and a half months after the arrest. As stated previously, Honorio ALBA was notified of the administrative investigation and complaint on Thursday, November 9, 2023. I understand that Veteran's Day was observed by the City of Albuquerque on Friday, November 10, 2023, thereby making Monday, November 13, 2023, the next business day. According to the DWI citation, the section titled, "BLOOD ALCOHOL CONCENTRATION" indicates, "REFUSAL."

124.    As detailed previously, W4 was arrested by Honorio ALBA on or about August 24, 2023, at 1:29 a.m. A review of telephone records obtained from Verizon Wireless indicates that

on or about August 24, 2023, between approximately 1:37 a.m. and 2:13 a.m., the **ALBA PHONE** exchanged approximately six (6) SMS text messages with the **MENDEZ PHONE**. Based on my training, experience, and familiarity of this investigation, there is probable cause to believe that Ricardo MENDEZ and Honorio ALBA discussed W4's arrest in these text messages.

125.    According to records obtained from Verizon Wireless, later that same day, on or about August 24, 2023, at approximately 12:38 p.m., the **MENDEZ PHONE** had an approximately 7 minute, 44 second telephone call with the phone number listed for W4 in the Albuquerque Police Department's Incident Report for the arrest.  Based on my training, experience, and familiarity with this investigation, there is probable cause to believe that Ricardo MENDEZ reached out to W4 to discuss their arrest by Honorio ALBA earlier that day. According to those same records, almost immediately thereafter, on or about August 24, 2023, at approximately 12:48 p.m., the **MENDEZ PHONE** had an approximately 15 minute, 52 second telephone call with the **ALBA PHONE**. Based on my training, experience, and familiarity with this investigation, there is probable cause to believe that, in this call, Ricardo MENDEZ and Honorio ALBA discussed W4's arrest.

126.    A review of pen register and trap and trace device information indicates that on November 9, 2023, at approximately 1:51 p.m. (which was the same day that Honorio ALBA was notified of the administrative investigation), the **ALBA PHONE** placed an outgoing call to the **MENDEZ PHONE** and had an approximately 12 minute, 51 second phone call. Based on my training, experience, and familiarity of this investigation, there is probable cause to believe that, in these calls, Ricardo MENDEZ and Honorio ALBA discussed W4's complaint against Honorio ALBA.

127. The following day, on or about November 10, 2023, at approximately 11:03 a.m., the **MENDEZ PHONE** had an approximately 9 minute, 59 second telephone call with the **ALBA PHONE**. Then, at approximately 11:35 a.m., 1:10 p.m., and 4:11 p.m., the **MENDEZ PHONE** had telephone calls with the **ALBA PHONE** that lasted approximately (1) 30 minutes, 17 seconds; (2) 7 minutes; and (3) 6 minutes, 13 seconds, respectively. Based on my training, experience, and familiarity of this investigation, there is probable cause to believe that, in these calls, Ricardo MENDEZ and Honorio ALBA continued to discuss W4's complaint against Honorio ALBA.

128. On or about November 11, 2023, the **ALBA PHONE** made an outgoing telephone call to the **MENDEZ PHONE** that lasted approximately 1 hour, 25 minutes, 52 seconds. Based on my training, experience, and familiarity of this investigation, there is probable cause to believe that, in this call, Ricardo MENDEZ and Honorio ALBA continued to discuss W4's complaint against Honorio ALBA.

129. On or about November 13, 2023 (which as detailed previously is the date Honorio ALBA appears to have filed the DWI citation on W4), at approximately 10:39 a.m., the **ALBA PHONE** placed an outgoing telephone call to the **MENDEZ PHONE** lasting approximately 16 minutes, 45 seconds. Based on my training, experience, and familiarity of this investigation, there is probable cause to believe that, in this calls, Ricardo MENDEZ and Honorio ALBA discussed the status of W4's case.

130. On or about November 10, 2023, CPOA investigators interviewed W4. Below is a summation of that interview as detailed in CPOA's investigative report:

> W4 was advised that a complaint had been received regarding the conduct of the officer related to his arrest for driving under the influence. W4 advised that he was at the gym and requested to be contacted on 11/13/2023 at 1000 hours. W4 asked what the complaint was regarding; the investigator advised W4 that the complaint was against the arresting officer and not him and read the complaint to W4.

The following questions were asked just in case the investigator was unable to reach W4 again. W4 was asked if he had the reported conversation with an officer; W4 stated, *"Umm, not that I remember."* W4 was asked if he had the reported conversation with Officer Alba, on or off duty, regarding his case; W4 stated, *"I, I don't remember."* W4 was advised that the investigator would contact him for a follow-up interview on 11/13/2023 at 1000 hours. The recorded interview concluded at approximately 1114 hours.

### TOLL AND PEN REGISTER/TRAP AND TRACE DATA

131.    An analysis of the toll record and pen register and trap and trace data[32] from October 4, 2022, to November 29, 2023, revealed that the **MENDEZ PHONE** was used to make or receive, *inter alia*, approximately 55 telephone calls and 806 text messages to or from the **MONTANO PHONE**, subscribed to by Joshua MONTANO, with the most recent call occurring on November 10, 2023, and the most recent text message occurring on November 28, 2023.[33]

132.    An analysis of the toll record and pen register and trap and trace data from October 4, 2022, to November 29, 2023, revealed that the **MENDEZ PHONE** was used to make or receive, *inter alia*, approximately 45 telephone calls and 1,618 text messages to or from the **ALBA PHONE**, subscribed to by Honorio ALBA, with the most recent call occurring on November 29, 2023, and the most recent text message occurring on November 28, 2023.[34]

---

[32] On September 12, 2023, the Honorable Steven C. Yarbrough, U.S. Magistrate for the District of New Mexico, signed an order authorizing the use of a pen register and trap and trace device on the **MENDEZ PHONE** for 60 days. This pen register and trap and trace became operational on or about September 14, 2023, and expired on November 12, 2023. Another pen register was obtained on November 13, 2023, and became operational on November 14, 2023. The second pen register remains active.

[33] These totals represent the number of calls and text messages observed in toll records from October 4, 2022, through September 12, 2023, combined with the number of calls and text messages in Pen Register and Trap and Trace data from September 14, 2023, through November 29, 2023.

[34] These totals represent the number of calls and text messages observed in toll records from October 4, 2022, through September 12, 2023, combined with the number of calls and text messages in Pen Register and Trap and Trace data from September 14, 2023, through November 19, 2023.

133.    Based on the foregoing information, I believe that probable cause exists to show to both **MENDEZ PHONE**, **MONTANO PHONE and ALBA PHONE** have been used to facilitate violations of the TARGET OFFENSES.

134.    Moreover, there is probable cause to believe that this illegal scheme has had an impact, and will continue to have an impact, on interstate commerce. As noted herein, because the scheme deprives the court of fees and fines associated with DWI convictions, which would otherwise have been paid to the state court for deposit and use in its crime laboratory fund. This fund is used to pay various expenses and costs associated with DWIs, including community programs to prevent DWI, testing and laboratory expenses, and traffic safety expenses. There is further probable cause to believe that these programs and expenses require goods that would have traveled in interstate commerce. There is probable cause to believe that goods associated with these purchases would have come from out-of-state. As such, there is probable cause to believe that this scheme decreased the revenue that would be paid to the State of New Mexico through court fees and fines that would have been used to purchase goods that would have traveled in interstate commerce.

135.    Further, my review of Verizon Wireless records of **MENDEZ PHONE** revealed that the aforementioned SMS text message exchanges between **MENDEZ PHONE** and **MONTANO PHONE** were transmitted through servers in Tempe, Arizona, and Aurora, Colorado. The records revealed the SMS text message exchanges between **MENDEZ PHONE** and **ALBA PHONE** were transmitted through servers in Tempe, Arizona, and Southlake, Texas. The records revealed the SMS text message exchanges between **MENDEZ PHONE** and CW1 were transmitted through servers in Tempe, Arizona, and Aurora, Colorado.  The records revealed the SMS text message exchanges between **MENDEZ PHONE** and CW1 were transmitted through

servers in Tempe, Arizona, and Aurora, Colorado. Based on my knowledge and experience and on the knowledge and experience of FBI Special Agent Sean Macmanus, a Cellular Analysis Survey Team Agent, who has received specialized training on Verizon Wireless and AT&T, SMS text messages sent from New Mexico using Verizon Wireless service are routed through servers outside of the state of New Mexico. As such, I submit there is probable cause to believe the text messages between **MENDEZ PHONE**, **ALBA PHONE**, and CW1 were transmitted interstate commerce as **MENDEZ PHONE's** service provider is Verizon Wireless.

136.    Based on the facts set forth in this affidavit, as noted above, there is probable cause to believe that Honorio ALBA has committed the TARGET OFFENSES. There is also probable cause to believe that Honorio ALBA has used **ALBA PHONE** in the commission of these offenses. Additionally, according to records provided by Verizon Wireless, Honorio ALBA is the subscriber and user of **ALBA PHONE**.

137.    Since on or about November 3, 2023, the FBI has served multiple preservation letters on Verizon Wireless to preserve the content of any communication, to include SMS and MMS text messages or files stored by or for **ALBA PHONE** and any associated accounts, and any information associated with those communications or files, such as the source and destination email addresses or IP addresses.

138.    For the reasons described below, there is probable cause to believe that the items sought from Verizon Wireless in Attachment B will contain fruits, evidence, and instrumentalities of the TARGET OFFENSES.

139.    In my training and experience, I have learned that Verizon Wireless is a company that provides cellular telephone access to the general public, and that stored electronic communications, including retrieved and unretrieved voicemail, text, and multimedia messages

for Verizon Wireless subscribers may be located on the computers of Verizon Wireless. Further, I am aware that computers located at Verizon Wireless contain information and other stored electronic communications belonging to unrelated third parties.

140.    Wireless phone providers often provide their subscribers with voicemail services. In general, a provider will store voicemail messages on behalf of a particular subscriber until the subscriber deletes the voicemail.  If the subscriber does not delete the message, the message may remain in the system of Verizon Wireless for weeks or months.

141.    Among the services commonly offered by wireless phone providers is the capacity to send short text or multimedia messages (photos, audio, or video) from one subscriber's phone or wireless device to another phone or wireless device via one or more wireless providers.  This service is often referred to as "Short Message Service" ("SMS") or "Multimedia Messaging Service" ("MMS"), and is often referred to generically as "text messaging." Based on my knowledge and experience, I believe that stored electronic communications, including SMS and MMS messages that have been sent or received by subscribers, may be stored by Verizon Wireless for short periods incident to and following their transmission.  In addition, providers occasionally retain printouts from original storage of text messages for a particular subscriber's account.

142.    Wireless phone providers typically retain certain transactional information about the use of each telephone, voicemail, and text-messaging account on their systems.  This information can include log files and messaging logs showing all activity on the account, such as local and long distance telephone connection records, records of session times and durations, lists of all incoming and outgoing telephone numbers or e-mail addresses associated with particular telephone calls, voicemail messages, and text or multimedia messages.  Providers may also have

information about the dates, times, and methods of connecting associated with every communication in which a particular cellular device was involved.

143.    Wireless providers may also retain text messaging logs that include specific information about text and multimedia messages sent or received from the account, such as the dates and times of the messages.  A provider may also retain information about which cellular handset or device was associated with the account when the messages were sent or received.  The provider could have this information because each cellular device has one or more unique identifiers embedded inside it. Depending upon the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Station Equipment Identity ("IMEI"). When a cellular device connects to a cellular antenna or tower, it reveals its embedded unique identifiers to the cellular antenna or tower in order to obtain service, and the cellular antenna or tower records those identifiers as a matter of course.

144.    Many wireless providers retain information about the location in which a particular communication was transmitted or received.  This information can include data about which "cell towers" (i.e., antenna towers covering specific geographic areas) received a radio signal from the cellular device and thereby transmitted or received the communication in question.

145.    Wireless providers also maintain business records and subscriber information for particular accounts.  This information could include the subscribers' full names and addresses, the address to which any equipment was shipped, the date on which the account was opened, the length of service, the types of service utilized, the ESN or other unique identifier for the cellular device

associated with the account, the subscribers' Social Security Numbers and dates of birth, all telephone numbers and other identifiers associated with the account, and a description of the services available to the account subscribers.  In addition, wireless providers typically generate and retain billing records for each account, which may show all billable calls (including outgoing digits dialed).  The providers may also have payment information for the account, including the dates, times and sometimes, places, of payments and the means and source of payment (including any credit card or bank account number).

146.   In some cases, wireless subscribers may communicate directly with a wireless provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.   Wireless providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

147.   As explained below, information stored at the wireless provider, including that described above, may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, the data pertaining to a particular cellular device that is retained by a wireless provider can indicate who has used or controlled the cellular device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, data collected at the time of account sign-up, information relating to account payments, and communications (and the data associated with the foregoing, such as date and time) may indicate who used or controlled a cellular device at a relevant time.  Further, such stored

electronic data can show how and when the cellular device and associated cellular service were accessed or used.    Such "timeline" information allows investigators to understand the chronological context of cellular device usage, account access, and events relating to the crime under investigation.    This "timeline" information may tend to either inculpate or exculpate the cellular device owner.    Additionally, information stored by the wireless provider may indicate the geographic location of the cellular device and user at a particular time (e.g., historic cell-site location information; location integrated into an image or video sent via text message to include both metadata and the physical location displayed in an image or video).    Last, stored electronic data may provide relevant insight into the state of mind of the cellular device's owner and/or user as it relates to the offense under investigation. For example, information relating to the cellular device in the possession of the wireless provider may indicate the owner's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement).

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

148.    I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Verizon Wireless to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

149.    Based on the forgoing, I request that the Court issue the proposed search warrant.

150.    Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

151.    The government will execute this warrant by serving the warrant on Verizon Wireless because the warrant will be served on Verizon Wireless, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

_____

Zackari S. Mercado
Special Agent
Federal Bureau of Investigation

Subscribed and sworn telephonically and signed electronically on December 4, 2023

_____

KAREN B. MOLZEN
UNITED STATES MAGISTRATE JUDGE

62

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with (505) 918-8132 that is stored at premises owned, maintained, controlled, or operated by Verizon Wireless, a wireless provider headquartered at 180 Washington Valley Road, Bedminster, New Jersey 07921.

**ATTACHMENT B**

**Particular Things to be Seized**

**Information to be disclosed by Verizon Wireless**

To the extent that the information described in Attachment A is within the possession, custody, or control of Verizon Wireless, regardless of whether such information is located within or outside of the United States, and including any messages, records, files, logs, or information that have been deleted but are still available to Verizon Wireless or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Verizon Wireless is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.      All voice mail, text, and multimedia messages from September 16, 2022, to Present stored and presently contained in, or on behalf of the account or identifier;

b.      All existing printouts from original storage of all of the text messages described above;

c.      All transactional information of all activity of the telephones and/or voicemail accounts described above, including log files, messaging logs, local and long-distance telephone connection records, records of session times and durations, dates and times of connecting, methods of connecting, telephone numbers associated with outgoing and incoming calls, cell towers used, and/or locations used from September 16, 2022, to Present;

d.      All text messaging logs, including date and time of messages, and identification numbers associated with the handsets sending and receiving the message from September 16, 2022, to Present;

e.      All business records and subscriber information, in any form kept, pertaining to the individual accounts and/or identifiers described above, including subscribers' full names,

addresses, shipping addresses, date account was opened, length of service, the types of service utilized, ESN (Electronic Serial Number) or other unique identifier for the wireless device associated with the account, Social Security number, date of birth, telephone numbers, and other identifiers associated with the account;

f.      Detailed billing records, showing all billable calls including outgoing digits, from September 16, 2022, to Present;

g.      All payment information, including dates and times of payments and means and source of payment (including any credit or bank account number), from September 16, 2022, to Present;

h.      Incoming and outgoing telephone numbers, from September 16, 2022, to Present;

i.      All records indicating the services available to subscribers of individual accounts and/or identifiers described above;

j.      All records pertaining to communications between Verizon Wireless and any person regarding the account or identifier, including contacts with support services and records of actions taken.

The Provider is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.

## Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. § 1951 (Hobbs Act extortion under color of official right), 18 U.S.C. § 371 (conspiracy), 18 U.S.C. § 666 (bribery), 18 U.S.C. §1343 (wire fraud) and 18 U.S.C. §1346 (honest services fraud) involving Ricardo MENDEZ, Honorio ALBA and Joshua

2

MONTANO, since September 16, 2022, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

a) Information that constitutes evidence of the identification or location of the user(s) of the account;

b) Information that constitutes evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts;

c) Information that constitutes evidence indicating the state of mind of Joshua MONTANO, Honorio ALBA and Ricardo MENDEZ, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, related to the criminal activity under investigation;

d) Information that constitutes evidence concerning how and when the account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the user of the account;

e) The content of communications that constitutes evidence of the criminal activity under investigation, including communications by and between Joshua MONTANO, Honorio ALBA and Ricardo MENDEZ, and by and between Honorio ALBA and any other coconspirators or accomplices;

f) Steps taken in furtherance of the criminal activity under investigation;

g) Evidence indicating in any way a motive to commit any the offenses detailed in this affidavit, or to otherwise engage in criminal activity;

h) Identification of coconspirators, accomplices, and aiders and abettors in the commission of the above offenses.

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.